IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TERRANCE SANDERS, } | |
| } | |
| Plaintiff, } | |
| } | CIVIL ACTION NO. |
| v. } | |
| } | 2:15-cv-1983-WMA |
| CAROLYN W. COLVIN, ACTING } | |
| COMMISSIONER OF SOCIAL } | |
| SECURITY, } | |
| } | |
| Defendant. } | |
| } | |

**MEMORANDUM OPINION**

Plaintiff Terrance Sanders brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's final decision denying his application for disability insurance benefits and supplemental security income. Sanders timely pursued and exhausted the administrative remedies available to him before the Social Security Administration. Based on the court's review of the record and the briefs submitted by the parties, the court finds that the Commissioner's decision is due to be affirmed.

**I.    STATUTORY AND REGULATORY FRAMEWORK**

To qualify for social security benefits, a non-elderly claimant must, *inter alia*, show that he is disabled. 42 U.S.C. §§ 423(a)(1)(D), 1381a (2012). A person is disabled if he is

unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (2012). To determine if a claimant is disabled, the Social Security Administration employs a five-step process, which is followed at each level of administrative review. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity. If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Second, the Commissioner must determine whether the claimant has "a severe medically determinable physical or mental impairment" expected to result in death or to last at least one year. If not, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Third, the Commissioner must determine if any of the claimant's impairments meets or exceeds the requirements of an impairment within the Listing of Impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the Commissioner has not made a conclusive determination after the third step, it

must assess the claimant's Residual Functional Capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The RFC measures the claimant's ability to work in spite of her impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Fourth, the Commissioner must determine if the claimant's RFC allows her to perform her past relevant work. If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Fifth, the Commissioner must determine whether there exist a significant number of jobs in the national economy that the claimant's RFC allows her to perform. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920 (a)(4)(v), 416.960(c). If a significant number of such jobs exist, the claimant is not disabled; if not, he is disabled. *Id.*

## II.   ADMINISTRATIVE DETERMINATION

In this case, the ALJ found that Sanders has not engaged in substantial gainful activity (R. at 13) and that he has the following severe impairments: cutaneous T cell lymphoma stage III ("CTCL"), degenerative disc disease of the cervical spine, and right arm radiculopathy (R. at 13). The ALJ further found however that Sanders did not have an impairment or combination of impairments that met or equaled those listed in 20 C.F.R. § 404 and its accompanying appendices. (R. at 14-15). The ALJ found that Sanders retained a RFC to perform work at all

3

exertional levels with the nonexertional limitation that he could only perform tasks that did not involve concentrated exposure to extreme heat, extreme humidity, or sustained direct sunlight, however, Sanders could frequently reach in all directions, including overhead, with the right, non-dominant extremity. (R. at 15-19). Finally, the ALJ found that Sanders could perform his past relevant work. (R. at 19-20, 44-45). Based on these findings, the ALJ determined that Sanders was not disabled and denied his application. (R. at 20).

## III.     DISCUSSION

In this case, Sanders challenges the ALJ's determination solely on the basis that in evaluating Sanders' RFC the ALJ failed to properly evaluate the credibility of Sanders' complaints of pain in accordance with the Eleventh Circuit's "pain standard." (Doc. 12 at 4). Specifically, Sanders challenged the ALJ's finding that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonable be expected to cause the alleged symptoms; however, the claimant's statement concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(R. at 16).

Eleventh Circuit precedent "requires that an ALJ apply a three part 'pain standard' when a claimant attempts to establish

disability through his or her own testimony of pain or other subjective symptoms." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The standard seeks to ensure that objective medical evidence confirms the existence or likelihood of the pain or other subjective symptoms complained of by the plaintiff.

In this case, the ALJ evaluated the credibility of Sanders' complaints under the Eleventh Circuit's "pain standard" and properly concluded that they were not supported by the objective medical evidence or that the objectively determined medical condition was of such severity that it could be reasonably expected to give rise to the alleged pain. (R. at 15-19).

Yet even if the plaintiff's testimony could satisfy the "pain standard," an ALJ may still discredit a plaintiff's testimony by articulating explicit and adequate reasons for doing so where such articulation is supported by substantial evidence. *Foote*, 67 F.3d at 1561–62; *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). "Failure to articulate the reasons

for discrediting subjective testimony," or a failure to support those reasons by substantial evidence, "requires, as a matter of law, that the testimony be accepted as true." *Wilson*, 284 F.3d at 1225.

In this case, the ALJ articulated explicit and adequate reasons for discrediting Sanders' testimony supported by substantial evidence.  While an ALJ "[may] not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual . . . [a] report of minimal or negative findings or inconsistencies in the objective medical evidence **is one of the many factors [an ALJ] must consider**." SSR 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, March 28, 2016. (emphasis added). Here the ALJ based its findings on not only the objective findings in the medical evidence of record, but also on the conservative treatment Sanders received his pain, the recent record evidence indicating Sanders' CTCL was stable even after inconsistent treatment with light therapy, and Sanders' work history. (R. at 16-19).

**A.   Objective medical evidence**

While the ALJ acknowledged Sanders' medical records showed

complaints relating to shoulder pain since September 2013 (R.at 17, 652, 658), contemporaneous exams showed normal extremity testing and generally normal neurological testing (R. at 653) alongside an x-ray showing only mild degenerative changes, with no evidence of acute fracture or sublaxation (R. at 17, 556-57). A follow-up exam in October 2013 showed Sanders had normal range of motion, normal extremity findings, and no focal deficits aside from some numbness to light touch in his right fingers. (R. at 646-47). While Sanders continued to complain of shoulder pain at a November 2013 follow-up, he acknowledged Lortab helped. (R. at 17, 639). Finally, in a December 2013 exam, while Sanders continued to complain of shoulder pain, he continued to have normal extremity testing, negative MRI findings, and a full range of motion (R. at 18, 554-55, 622, 639-40) where the treating physician advised exercising regularly (R. at 554-55, 639-40). In February 2014, one of Sanders' treating physicians, Dr. Warren Blackburn, noted that he did not see a need for a non-VA consultation for Sanders' shoulder pain as MRI tests did not show clinically important nerve root impingement. (R. at 18, 567). Despite Dr. Blackburn's note, in March 2014 Sanders visited Dr. Martin Jones, yet Dr. Jones did not see anything that would cause Sanders' arm pain while still recommending a nerve conduction

study. (R. at 18, 792). Sanders' later visit with Dr. Jason Morris for the nerve conduction study showed no significant neuropathy. (R. at 543, 590). While Sanders consistently complained of pain, there is substantial and objective medical evidence to support the ALJ's findings.

**B.   Conservative treatment for pain**

While the ALJ acknowledged that Sanders complained of shoulder pain, the ALJ did not find these complaints credible in light of the generally conservative treatment prescribed for his pain symptoms. In November 2013, Sanders was prescribed Lortab and acknowledged that this helped the pain. (R. at 17, 639). In December 2013, Sanders' treating physician changed his medication and prescribed the conservative treatment of using a tennis ball and warm rice sock to massage his shoulder (R. at 18, 623). In a January 2014 exam following this conservative treatment recommendation, Sanders had normal extremity testing, a full range of motion (R. at 614), and a same day neurosurgical consultation showing that he had 4/5 right upper extremity motor strength, full 5/5 strength in his upper extremity, and normal deep tendon reflexes (R. at 18, 570). While Sanders consistently complained of pain, the conservative treatment for pain constitutes substantial evidence in support of the ALJ's findings.

### C. Effective treatment of CTCL

While the ALJ acknowledges Sanders' diagnosis of CTCL, the objective findings and effective treatment of his CTCL support the ALJ's discrediting of Sanders' subjective complaints. Specifically, the frequency and type of treatment Sanders recieved from April 2012 through 2014 for his CTCL were inconsistent with the type of limitations Sanders alleged at his hearing. (R. at 16, 33-34). While Sanders testified he only missed therapy when he was sick or lacked transportation, there is no indication that he reported this to his treating physicians and is undercut by his large number of missed appointments. (R. at 17). Even when Sanders was unemployed, he continued to miss therapy treatments. (R. at 17).

In January 2008, Sanders began undergoing PUVA therapy (a type of light therapy used to treat skin conditions) and using topical steroids. (R. at 30, 399-400). Throughout 2008, treatment notes indicate the PUVA therapy was effective and his doctors advised that he continue this therapy three times a week. (R. at 16, 342, 395-96). Yet in November 2009, Sanders reported he had stopped PUVA therapy by February 2009 and was using only topical steroids to treat his CTCL. (R. at 16, 322). In February 2011 Sanders again reported he was only using topical steroids and that his CTCL had been stable and minimal

since discontinuing PUVA therapy. (R. at 16, 258-59). After an exam showed erythematous plaque on Sanders' left cheek and some pink or hyperpigmented patches on his scalp, chest, shoulders, and back, Sanders was advised to restart PUVA therapy three thimes a week. (R. at 16, 259). Upon complaints of an upset stomach relating to the PUVA therapy, Sanders was switched to nbUVB therapy. (R. at 16, 295). Sanders underwent this treatment three times a week from April 2012 through October 2012. (R. at 458-62). In an October 2012 exam, Sanders' CTCL was noted to have improved and he was advised to decrease nbUVB treatments to two times a week, with the possibility of decreasing treatment to one time a month if the CTCL did not flare up after the first reduction. (R. at 16, 453). Sanders continued treatment twice a week through December 2013, did not undergo any treatment in January 2014, and underwent treatment only once in February 2014. (R. at 17, 631, 672, 677, 681). At a February 2014 dermatology exam, Sanders reported that the lesions on his chest appeared a lot smaller, the lesions did not appear to be getting worse, and that he felt he was doing better. (R. at 17, 597, 608). Sanders did not receive any nbUVB treatment in March 2014 (R. at 17, 681) and at his last dermatology clinic exam in April 2014 Sanders reported that he felt overall improvement with his CTCL and no symptoms aside

10

from some fatigue and night sweats (R. at 17, 841).  These medical records relating to Sanders' CTCL show that he attended CTCL light therapy once a month or less  (R. at 16-17, 295, 453, 597, 608, 631, 672, 677, 681, 841) and yet despite the infrequency of treatment Sanders showed improvement.  Therefore, Sanders' effective treatment of CTCL, despite his attendance infrequency, constitutes substantial evidence in support of the ALJ's findings

### D. Work history

Finally, Sanders' work history supports the ALJ's discrediting of Sanders' subjective complaints.  While the ALJ acknowledged that Sanders stopped working, it was not due to his impairments or from missing too much work to attend CTCL light therapy, but instead was because the company that employed Sanders closed. (R. at 18, 32-33).  Sanders testified that when he was employee, he needed to miss work on the days he received light therapy treatment, yet this testimony is undercut by the fact that Sanders infrequently attended these therapy sessions. (R. at 17).  Further, Sanders testified that these light therapy treatments lasted only 5-15 minutes. (R. at 17).  Therefore, Sanders' work history constitutes substantial evidence in support of the ALJ's findings.

**CONCLUSION**

Because the ALJ's determination is supported by substantial evidence, the Commissioner's final decision is due to be affirmed. A separate order will be entered.

**DONE** this 11th day of August, 2016.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE